**J. DAVID NICK, Esq. (**SB#157687)
99 Osgood Place, Ste 1
San Francisco, CA 94133
Tel: (415) 552-4444
Fax: (415) 358-5897

**EDITTE  LERMAN, Esq. (**SB#241471)
45060 Ukiah Street
P.O. Box 802
Mendocino, CA 95460
Tel: (707) 937-1711
Fax: (707) 937-2207

Attorneys for Plaintiff
ZACHARIAH JUDSON RUTLEDGE

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

\* \* \* \* \* \*

| | |
|---|---|
| ZACHARIAH JUDSON RUTLEDGE, | CASE NO.: CV 07-04274 CW |
| Plaintiff, | **PLAINTIFF'S THIRD REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION TO DEFENDANTS' SECOND MOTION TO DISMISS** |
| vs. | |
| COUNTY OF SONOMA, MICHAEL POTTS, RUSSEL L. DAVIDSON, JAMES PATRICK CASEY, CHRISTINE M. COOK, BEAU R. MARTIN, J. MICHAEL MULLINS, STEPHAN R. PASSALACQUA, GREG JACOBS, SONOMA COUNTY SHERIFF'S DEPARTMENT, SONOMA COUNTY DISTRICT ATTORNEY'S OFFICE, and DOES 1 through 40. | Date: September 16, 2008<br>Time:    2:00 p.m.<br>Courtroom: 2 (4th Floor)<br>Judge: Hon. Claudia Wilken |
| Defendants. | |

1    COMES NOW Plaintiff, Zachariah Rutledge, and respectfully requests that the Court

2    take judicial notice, pursuant to Rules 201 and 302 of the Federal Rules of Evidence, of the

3    following documents:

4    Exhibit 10 - June 14, 2004, Ruling on 2nd Nonstatutory Motion to Dismiss

5    Exhibit 11 - Official Job description of "Criminalist;" *California State Personnel Board*,

6    http://www.dpa.ca.gov/textdocs/specs/s8/s8466.txt.

7

8    State of California Courts take judicial notice of this document under California Evidence

9    Code § 452(c) regarding official acts of a legislative/executive department of a state. Further,

10    State of California Courts may take judicial notice of this document under California Evidence

11    Code § 452(h) in that it provides facts and propositions that are not reasonably subject to

12    dispute and are capable of immediate and accurate determination by resort to sources of

13    reasonably indisputable accuracy.

14

15    Dated:  August 26, 2008

16    Respectfully submitted,

17

18    ------------------/s/------------------
     Editte Lerman
19    Attorney for Plaintiff
     Zachariah Rutledge

20

21

22

23

24

25

26

**DECLARATION OF SERVICE**

I, Editte D. Lerman, declare as follows:
I am a resident of the State of California, residing or employed in Mendocino, California.
I am over the age of 18 years and am not a party to the above-entitled action. My business
address is 45060 Ukiah Street P.O. Box 802, Mendocino C.A. 95460.

On August 26, 2008,

**PLAINTIFF'S THIRD REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
OPPOSITION TO DEFENDANTS' SECOND MOTION TO DISMISS**

was filed and served upon the following parties via the Court's PACER-ECF electronic
filing system.

***Attorneys for Defendant Michael Potts***
EDMUND G BROWN, JR.
Attorney General of the State of California
JOHN P. DEVINE, ESQ.
Deputy Attorney General of the State of California
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004

***Attorneys for Defendants County of Sonoma, Sonoma County Sheriff's
Department, Sonoma County District Attorney's Office, Stephan Passalacqua,
J. Michael Mullins, Greg Jacobs, Christine M. Cook, Russel L. Davidson,
James Patrick Casey, and Detective***
Beau M. Martin
Michael D. Senneff
Bonnie A. Freeman
SENNEFF FREEMAN & BLUESTONE, LLP
50 Old Courthouse Square, Suite 401
P.O. Box 3727
Santa Rosa, CA 95402-3729

I declare under penalty of perjury that the foregoing is true and correct and that this
declaration was executed this 26th day of August, 2008, at Mendocino, California.

---------------/s/-------------------
Edite Lerman

Exhibit 10

COPY

1                    SUPERIOR COURT OF CALIFORNIA

2                        COUNTY OF SONOMA

3                HONORABLE RAIMA BALLINGER, JUDGE

4                           . . .

5    PEOPLE OF THE STATE OF CALIFORNIA,  )
                                         )
6                    Plaintiff,          )
                                         )
7         v.                             )
                                         )
8    ZACHARIAH RUTLEDGE,                 )
                                         )
9                    Defendant.          )
     ────────────────────────────────── )
10                                       )
                         Case No. SCR-32528
11                       Date:  June 14, 2004
                         Time:  1:30 p.m.
12                       Courtroom:  2

13

14                   REPORTER'S TRANSCRIPT OF

15           RULING ON NONSTATUTORY MOTION TO DISMISS

16

17                 A P P E A R A N C E S

18    For the People:            Stephan Passalacqua
                                 District Attorney
19                               By:  GREG JACOBS, ESQ.
                                 By:  CHRISTINE COOK, ESQ.
20                               Deputy District Attorney
                                 212-J Hall of Justice
21                               Santa Rosa, CA 95403

22    For the Defendant:         J. DAVID NICK, ESQ.
                                 Attorney at Law
23                               294 Page Street
                                 San Francisco, CA 94102
24

25              CARLOS A. MARTINEZ, CSR #10620
                  Certified Shorthand Reporter
26            600 Administration Drive, Room 218-J
                    Santa Rosa, CA 95403
27                    (707) 565-2551

28

                                                              1

1          Monday, June 14, 2004

2                    . . .

3          **THE COURT:**   Court's on the record in People versus

4    Rutledge.   Mr. Rutledge is present in custody with Mr. Nick.

5    Ms. Cook and Mr. Jacobs for the People.

6          We are on calendar today for this Court to rule on

7    several motions upon which we've had testimony over the last

8    months.   However, there is only one ruling that the Court is

9    going to make today, which is a ruling with respect to the

10   nonstatutory 995 motion which Mr. Nick made previously and which

11   this Court now is reconsidering, as well as his oral motion made

12   a couple of weeks ago in the midst of some testimony actually on

13   another motion.

14         With respect to holding orders, I'm going to be quoting

15   some cases on all of these various issues, and I'm going to take

16   my time for the benefit of the court reporter.

17         The Court is now quoting a case People vs. Encerti,

18   E-N-C-E-R-T-I, 130 Cal.App.3d 791.   Quote:

19              "The evidences necessary to support a

20         commitment to the trial court is a state of facts that

21         would lead a person of ordinary caution and prudence to

22         believe and conscientiously attain a strong suspicion

23         of the guilt of the accused."

24         The Court is now quoting from People vs. Johnson, 26

25   Cal.3d 557 at page 577.

26              "When reviewing the sufficiency of the

27         evidence, the Court also has the duty to resolve the

28         issue in light of the whole record and may not limit

                                                              2

1          its appraisal to isolated bits of evidence selected by

2          the prosecution."

3               With respect to a nonstatutory 995, the Court is going

4     to quote the Merrill court.

5               **MR. NICK:**  Did the Court mean a nonstatutory 995?

6               **THE COURT:**  Nonstatutory 995 if that's not what I said.

7               The Court will quote the Merrill court cited at 27

8     Cal.App.4th 1586 at page 1596.  Quote:

9                    "In contrast, the nonstatutory motion to

10          dismiss is the appropriate vehicle for redress of an

11          error not known or visible at the hearing itself."

12               And, again, the same page:

13                    "In other words, you can't ascertain the

14          problem," and I'm stating that in this case, problems,

15          "from the preliminary hearing transcript itself,

16          therefore, the nonstatutory motion to dismiss was

17          properly filed in this case."

18               With respect to whether or not a second one can be

19     filed, the Court quotes the Sherwin case at 82 Cal.App.4th 1404

20     at page 1411 which says that:

21                    "A second 995 motion may be justified by

22          changed circumstances or newly discovered information,"

23          which is what this Court has found here.

24               I want to go over some definitions which I think are

25     helpful to people listening to what the Court is saying and who

26     may not be lawyers.

27               "Exculpatory" and "material" means:

28                    "Evidence that has a reasonable probability

3

1        of changing the outcome used by the defense."

2              And that's <u>Brady</u> language.

3              "Favorable to the defense" is:

4                    "Evidence that the defendant could either use

5        to impeach the state's witnesses or exculpate the

6        accused."

7              That's also cited in <u>People vs. Orland</u> at 13 Cal.4th

8        1962.

9              "Material" is:

10                   "Evidence is material if there is a

11       reasonable probability that the result of the

12       proceeding would have been different had the evidence

13       been disclosed to the defendant."

14             A reasonable probability is one sufficient to, quote:

15                   "Undermine confidence in the outcome."

16             And that comes from <u>US vs. Bagley</u>, 473 US 667 at page

17       678.

18             I'm going to talk a few minutes now about the discovery

19       problems that became exceedingly apparent to the Court.

20             First, Ande Thomas, the public defender who represented

21       defendant at the preliminary hearing, prior to the preliminary

22       hearing informally asked for production of lab analysis on the

23       knife and on other -- well, the wallboard.  I think there was a

24       window frame.  He asked for, as he stated, paint evidence.  He

25       also testified that he had retained the services of a lab in June

26       of '02 and at that point he was focused on the paint analysis.

27             He stated that he spoke with the prosecutor assigned to

28       the preliminary hearing.  The prosecutor would not provide any

                                                                        4

1    more discovery than had been provided.  He would not provide any

2    bench notes.  He was adamant about this.  Mr. Thomas used the

3    words "soundly rebuffed" in his testimony when he stated that he

4    wanted to retest the paint.

5            He was told that requests -- that the request that he

6    had made far exceeded what he had a right to get for the

7    preliminary hearing.  He felt that all of the -- and I'm quoting

8    now actually from testimony from Mr. Casey who was the prosecutor

9    at the preliminary hearing and testified to what I'm about to

10   say.

11           He felt that, and he testified just recently that:

12               "Mr. Thomas's request far exceeded what they

13          had a right to get for the preliminary hearing."

14               He felt that:

15               "All of the public defender's discovery

16          requests were premature and that we already gave them

17          beyond what they should have had; that they already had

18          the lab notes but the lab notes were just

19          conclusionary."  That's all they had.

20           And the Court is going to explain later, but certainly

21   what was not provided were the bench notes that would have been

22   the basis for effective cross-examination at the preliminary

23   hearing.

24           There were emails that the Court has read, and I'm

25   referring now to Court's Exhibit 54, because I can talk a lot

26   about what these emails are about, but I think that you need to

27   hear them.

28               "Mr. Thomas, your investigator Mr. Johnson

                                                                    5

1    seems a bit unclear as to what is covered by the
2    recently executed discovery authorization letter sent
3    to you by the district attorney's office.  I trust that
4    this note will clarify any ambiguity perceived by the
5    defense.
6            The discovery authorization letter gives you
7    access to all the evidence in the above-noted matter
8    within the custody and/or control of the Sonoma County
9    Sheriff's Department.  That is to say, you may view or
10   copy evidence upon making the appropriate arrangements
11   with the sheriff's department.
12           The discovery authorization letter has no
13   nexus to the defense informal request for certain items
14   pursuant to Penal Code section 1054 et seq. and dated
15   30 September 2002.  This defense document seems, to say
16   the least, a bit premature.  Penal Code section 1054 et
17   seq., as I'm sure you are well aware, speaks to the
18   trial aspect of the criminal justice system.  One finds
19   in Penal Code section 1054 pren A unpren the essential
20   philosophy of the entire statute, quote, to promote the
21   ascertainment of truth in trials by requiring timely
22   pretrial discovery, unquote.  It is of note that the
23   preliminary examination in the other above-noted matter
24   has not yet taken place.  It will not take place for
25   another five weeks.
26           Putting aside the, quote, cart before the
27   horse, end quote, defense interpretation of Penal Code
28   1054 et seq, the People at the appropriate procedural

6

1          point in time will have a number of objections to the
2          items outlined in your document of 30 September 2002.
3                      Finally, case law of California recognizes a
4          significant distinction between the discovery required
5          for the preliminary examination and that required for
6          trial.
7                  Respectfully, James Patrick Casey, Deputy District
8      Attorney."
9                  And this was sent to Mr. Thomas apparently on
10     October 9th.
11                 Mr. Thomas emailed back on October 10th:
12                     "Please provide me with citations to the case
13         law to which you refer in the last sentence of your
14         message.  Thank you.  Signed, Ande."
15                 And a response was again made that same day from
16     Mr. Casey to Mr. Thomas that states:
17                     "Mr. Thomas, it's called a law library, and
18         the activity that takes place therein is called legal
19         research.
20                      Respectfully, James Patrick Casey, Deputy
21         District Attorney."
22                 Mr. Tom Johnson, the public defender investigator, was
23     trying to set up a procedure to retest the paint and the
24     wallboard prior to the preliminary hearing.  When that wasn't
25     forthcoming, Mr. Thomas filed a formal discovery motion which
26     this Court finds a necessity almost unheard of in this county.√
27     The formal discovery motion included at item 12:
28                     "Any and all notes pertaining to forensic

7

1    tests or analysis performed in the case including but
2    not limited to the bench notes relating to the analysis
3    of the paint found on the knife located at the murder
4    scene as well as the paint found in defendant's
5    residence."
6         Judge Daum heard the motion on October 30th, 2002, and
7    he issued a ruling.  The Court is going to quote from that
8    transcript at page 16 starting at line 16:
9         "MR. THOMAS:  That's all right, Your Honor.
10   I don't need to make a record on that.
11        With respect to item 12, it's been
12   represented, if I understand correctly, that all of the
13   bench notes and any other notes pertaining to any
14   forensic analysis, whether it be of the paint,
15   ballistics, or otherwise, are available at the
16   Department of Justice.
17        "THE COURT:  Not my understanding from what's
18   been stated early per --
19        "MR. CASEY:  Your Honor, as we said earlier,
20   they are available via the discovery authorization
21   letter, and one wonders why two weeks before the
22   preliminary hearing no attempt has been made to use
23   that discovery authorization letter to get these
24   various items?
25        "THE COURT:  In any case, No. 12 I believe is
26   appropriate, and however those can be made available,
27   they ought to be.  And the defense will have a chance
28   to consider them at least for some limited period of

8

1    time.

2            "MR. THOMAS:  Is the Court ruling if they're

3    not available at the Department of Justice in the

4    fashion Mr. Casey suggests that they should be

5    provided?

6            "MR. CASEY:  Your Honor --

7            "THE COURT:  They should be provided in

8    whatever form they exist, that is, any and all notes

9    pertaining to forensic tests or analysis performed in

10   this case.

11           "MR. CASEY:  Respectfully, is the Court

12   ordering the People to provide that?  That is covered

13   by their authorization letter.

14           "THE COURT:  Right.  What's being ordered is

15   that those will be available to the defense and as has

16   already been indicated by Mr. Casey that they are now

17   available in whatever form through the DOJ.  That would

18   be sufficient for the Court's purposes."

19           When Mr. Casey testified on this issue, he did not

20   recall a hearing on the discovery motion.  He did not recall

21   receiving a discovery request from Mr. Thomas, and he did not

22   recall a discovery order from Judge Daum.

23           The Court notes that what was provided is reflected in

24   Court's Exhibit 66.  It's entitled "Physical Evidence Examination

25   Report," and it's an additional report which the Court reviewed

26   here, and it appeared to be a summary.  Certainly that can be

27   reviewed as necessary.

28           I'm going to talk for a few minutes about the bench

                                                                      9

1　notes themselves.

2　　　　Nobody is in dispute at this time that pages 1 through
3　39 didn't get provided to the public defender prior to the
4　preliminary hearing.  Mr. Potts prepared what was provided.  He
5　prepared two copies which were pages 40 and on.  One set of
6　copies went to the DA.  The other set went to the public
7　defender.  He also authored a cover letter which we have been
8　calling in this proceeding the "Jim/Mike note."  It appears, when
9　you look at it as a whole, that was probably the cover letter to
10　the bench notes forwarding on that he provided.

11　　　　He stated in testimony that he had discussed with
12　Mr. Casey what he was sending.  He stated that it's his memory
13　that -- or "his interpretation" was the words he used that the
14　public defender's office through Mr. Johnson had only requested
15　testing on the wallboard.  He discussed this with Mr. Casey, and
16　in fact I'll talk later that Mr. Casey acknowledges this
17　conversation.

18　　　　His memory, Mr. Potts's memory, was that he was told to
19　just send what they requested -- or only supply what they
20　specifically request.  So he said it two different ways during
21　his testimony.

22　　　　However, I want to read now some information from
23　Court's Exhibit 62 which is Mr. Potts's running chronology in his
24　file, and it's entitled "Verbal Communications."

25　　　　On October 10th of '02 he states he got:

26　　　　　　"A telephone call from Deputy DA James Casey.
27　　　I gave him preliminary results of the ID of CF27 and
28　　　CF55 to BB8.  I asked him if he needed a preliminary

10

1    report tomorrow?  He said no, do what I can.  Do what I

2    can and get him a report in two weeks," which would

3    have been days before the preliminary hearing.

4         There's a date of October 30th, '02, another telephone

5    call with Mr. Casey.

6              "Defense will be asking for copies of Mike

7    Potts's notes on the knife.  He approved release of any

8    notes that they asked for.  I discussed my progress on

9    the cartridge cases and the bullets."

10        There's another note on October 30th of '02:

11             "Telephone call from Tom Johnson, Sonoma

12   County Public Defender's Office.  Wanted a copy of the

13   notes on the paint."

14        The chronology then goes on on November 7th, '02.

15             "Telephone call from Brad Burke.  He needs to

16   pick up the evidence for the preliminary hearing."

17        And on October 2nd of '02:

18             "Telephone call from Tom Johnson, Sonoma

19   County Public Defender's Office.  Where are pages 1

20   through 39?  I told him that his office only requested

21   the notes on pages covering the paint analysis so

22   that's what they were sent."

23        We know now that they didn't get all the paint analysis

24   notes.  It's okay and not necessary to send the remainder of the

25   notes.

26        And as I'm looking at the chronology, these appear to

27   be telephone conversations perhaps with various people involved

28   at the lab.  However, this is a chronology that's kept in the

                                                              11

file and would be available to anyone who was preparing a set of
notes to send out to either the DA or to the public defender.

Mr. Potts says he never talked to Mr. Casey about any
Court order on discovery, and he never saw one.

Mr. Casey testified that he was aware that the public
defender requested bench notes prior to the preliminary hearing.
He says Mr. Potts handled it by telephone.  He does acknowledge a
conversation with Mr. Potts about bench notes and what the public
defender wanted.  He authorized the release.

He stated:

"I'm assuming Potts told me what they
requested."

He could not recall if he reviewed what Mr. Potts
provided.

He acknowledged several conversations with Mr. Potts
prior to the preliminary hearing about the knife and paint
comparisons.

He doesn't remember a conversation with Mr. Potts
concerning the broken testing instrument.

He can't remember if bench notes were provided before
or after the preliminary hearing.

He did specifically remember about the case that there
were four layers of paint, different colors, and that they
matched.

He did not ask Mr. Potts if each layer was tested.

The Court notes that the significant bench notes that
were not transmitted to the public defender were pages 4, 5, 6,
7, 8 which not only show diagrams of the knife on pages 4 and 5

12

1    but actually testing results having to do with the knife.

2            I'm going to go now to what we've been referring to as

3    the "Jim/Mike note."

4            This note the Court is interpreting as a cover letter

5    to the bench notes that were provided to the district attorney

6    and to the public defender.  It reminds Mr. Casey about the need,

7    in Mr. Potts's view, for an elemental analysis.  This memo

8    advises the prosecution that all -- not all the bench notes were

9    provided.  In fact, he says he only provided about a third of

10   them.

11           He reminded Mr. Casey that there were additional pages

12   that he hadn't sent, and I'm referring to Court's Exhibit 44, and

13   I probably should just read it for clarity.

14           It reads:

15               "Jim, enclosed is a copy of the lab notes

16          covering the analysis that was performed on the paint

17          found on the knife in the Grahlmann and Blore case

18          requested by the Public Defender.

19               These are only a third of the notes that I

20          have on this case.  So, let me know if you want all the

21          notes now or as requested.

22               In addition, I left you a voice mail message

23          about doing the elemental analysis of the paint on the

24          knife that we previously talked about doing.  Give me a

25          call and let me know what you want to do.

26               Mike Potts."

27           Mr. Casey testified that he didn't receive the memo,

28   not that he did not remember it, but that he did not receive the

13

1   memo.

2            The Court notes, however, that the memo must have been

3   in the district attorney's file because it was forwarded to

4   Dr. Clark Deeds by the district attorney's office as part of a

5   large packet.

6            Mr. Chris Reynolds, who is the investigator employed by

7   the defense in this case, discovered that memo, Court's Exhibit

8   44, during his interview with the psychologist.

9            Talking a little bit about this business about

10  elemental analysis.

11           Mr. Potts is clear on the stand that he talked to

12  Mr. Casey about the need for an elemental analysis, that he

13  needed that to complete the testing.

14           He stated at least recently on the record that both of

15  these examinations needed to be done, in other words, the FTIR

16  instrumental exam and the elemental analysis in order to have a

17  complete analysis.

18           He related that at the time that he first spoke that

19  his equipment needed to be repaired.  He stated that he did talk

20  to Mr. Casey about the exams that he did which he characterized

21  as "exclusionary tests."

22           He said that he told Mr. Casey he wanted to do the

23  additional test, in fact he needed it, and he stated recently

24  under examination that me mentioned that more than once to

25  Mr. Casey.

26           Mr. Casey testified that he confirms that Mr. Potts

27  told him that there was a instrument that could do an elemental

28  analysis.  He called it a "confirmatory test," and he knew that

                                                              14

1    prior to the prelim.

2           He stated that it's his memory that Mr. Potts told him

3    it was a new test that was not available at the time of the

4    murders.

5           He doesn't remember any conversation at all about

6    broken testing instruments.

7           He has no memory of Mr. Potts requesting to perform the

8    tests or that the test was needed to complete the analysis.

9           Mr. Casey testified that he had no interest in

10   discussing the test with Mr. Potts.

11          I'll talk for a few minutes about the research article

12   that we're now very familiar with.

13          Mr. Potts testified that Mr. Casey asked him to find

14   research with respect to paint analysis.

15          Mr. Potts testified that he was another -- let me start

16   over.

17          Mr. Potts testified that Mr. Casey asked him to find

18   the research on paint analysis.  However, Mr. Davidson testified

19   that he spoke to Mr. Potts prior to the preliminary hearing and

20   prior to Mr. Casey being assigned to the case about the article.

21          No one disputes that Mr. Potts stated to everybody that

22   this was the only article on paint comparison in scientific

23   literature that he was able to find.

24          Mr. Potts stated on the stand that he did discuss this

25   article with Mr. Casey.

26          He stated that he told Mr. Casey that the study might

27   not be applicable to the Rutledge case.

28          He stated that he informed Mr. Casey that the paper did

15

1    not address chemical composition.

2            He stated that Mr. Casey knew that he had not done an

3    elemental analysis because that was the subject of the Jim/Mike

4    letter and of their conversations.

5            Mr. Potts stated that Mr. Casey did not indicate that

6    he did not understand when they discussed the testing procedures.

7            Mr. Potts was adamant on the stand that he warned

8    Mr. Casey of the inapplicability of the research article and that

9    he warned him of the pitfalls of the article.

10            Mr. Casey had a completely different view point about

11    this particular article.  He stated that he didn't spend any time

12    with Mr. Potts prior to the testimony at the preliminary hearing

13    discussing what his scientific findings were; that this was a low

14    priority, which was discussing any of this with Mr. Potts was a

15    low priority.

16            Mr. Casey confirmed that he did read the article; that

17    Mr. Potts told him it was the only research that he could find,

18    but he, Mr. Casey, was adamant that he never was warned about the

19    applicability of the article; that he did not talk with Mr. Potts

20    about the application of the study to the current test; that he

21    did not discuss with Mr. Potts about what tests he did or did not

22    perform; that he stated during recent testimony that at the

23    preliminary hearing stage he had no desire to go into science;

24    and that he made no inquiry of Mr. Potts beyond the conclusionary

25    information in Mr. Potts's report.

26            He found that the article was a foundation for and

27    strong buttress of the tests done on the paint samples.

28            He viewed the article in a favorable light.

16

1    He stated that he did not discuss statistical findings

2    of the article with Mr. Potts, and he did not discuss

3    testimony -- well -- strike that.

4        There was some testimony from Detective Davidson where

5    he confirmed he had discussed this specific article with

6    Mr. Potts in advance of the preliminary hearing.  They discussed

7    the statistical probabilities of the report, and Detective

8    Davidson stated that Mr. Potts told him that the article allowed

9    him to come to a scientific opinion which could be presented to

10   the preliminary hearing magistrate.

11       Detective Davidson also stated that Mr. Potts did

12   discuss the shortcomings of the article with him.  They discussed

13   the extreme age of this scientific article being 40 plus years

14   and the fact that it came from a completely different country,

15   that it came from Europe, in fact, Wales.

16       The Court is going to discuss now Mr. Potts's

17   testimony.

18       Mr. Potts testified that the paint on the knife matches

19   the paint on the other two items not only in color but also layer

20   sequence and type of paint, and the chemical analysis on there is

21   the same as well.

22       When he was asked about what was examined, he testified

23   that we're talking about four separate layers and four different

24   colored layers as well.

25       When the subject of match came up, he testified that it

26   not only matches in color, in other words, the color of the paint

27   on the knife, but also the layer sequence, and the colors of each

28   of those layers is the same that appears on the knife, and the

17

1    chemical composition of the paint that was on the knife matches

2    the same chemical composition of each one of those layers.

3              With respect to the scientific study, he formed

4    conclusions which he represented to the Court in that if only one

5    layer matched, it would be a 250,000 to 1 match.  However, in

6    this case he stated since all four layers matched between the

7    paint and the wallboard that it was a million to 1.

8              Since then Mr. Potts has produced what's become Court's

9    Exhibit 56, which is difficult for this Court to represent, but

10   perhaps you could represent it as affirmative misrepresentation.

11             I'll talk a little bit about the DA's duty to know his

12   evidence.

13              "The prosecution is presumed to know what the

14         police know.  This extends to all agents who are

15         working on behalf of the prosecution."

16             That comes directly from Kyles vs. Whitley, 115 US

17   1555.

18              "The individual prosecutor is responsible for

19         prosecutorial discovery errors under the team concept

20         theory."

21             Talking about People vs. Robinson at 31 Cal.App.4th

22   494.

23             In this case the Court found that the prosecution's

24   burden to disclose extended to the raw notes of a fire

25   investigator.  The prosecution was found to have constructive

26   possession of the notes.

27             In the case In Re Brown at 17 Cal.4th 873:

28              "The Court found that it was the district

                                                              18

1    attorney's duty to review lab files for exculpatory

2    evidence and that the crime lab's failure to advise the

3    district attorney of a worksheet did not relieve the DA

4    of the obligation to review the lab files."

5         It does appear from this case that the DA must

6    understand what he is reviewing because all of that information

7    is reputed to him.

8         The Merrill Court says, that's Merrill 27 Cal.App.4th

9    1586 at page 1594:

10             "Whether the failure was intentional or

11    negligent is irrelevant, its occurrence undermines the

12    public's confidence in the criminal justice system."

13        Quoting from Brown again at 17 Cal.4th 873:

14             "The individual prosecutor is presumed to

15    have knowledge of all information gathered in

16    connection with the government's case.  This duty is

17    nondelegable at least to the extent that the prosecutor

18    remains responsible for any lapse in compliance."

19        And at page 883 of the Brown case:

20             "This obligation serves to justify trust in

21    the district attorney as, quote, the representative of

22    the sovereignty whose interest in a crime prosecution

23    is not that it shall win a case but that justice shall

24    be done."

25        That's quoting Kyles vs. Whitley, 514 US 419 at page

26    439.

27        Let's focus a little bit about what we're doing here.

28        Does the Brady case require disclosure prior to the

19

1  preliminary hearing?  Well, yes, it does.  Although no case
2  expressly states that Brady applies to discovery prior to a
3  preliminary hearing, California case law is clear that the
4  prosecutor's duty to disclose favorable evidence to the defendant
5  applies to prepreliminary hearing discovery.
6      In Merrill vs. Superior Court, 27 Cal.App.4th 1586, the
7  defendant claimed that she was denied a substantial preliminary
8  hearing right by the district attorney's nondisclosure of
9  material evidence.
10      The Merrill Court did not find any distinction between
11  nondisclosures before trial and nondisclosures before preliminary
12  hearing.  The Court simply acknowledged that the prosecution has
13  a duty to disclose all substantial material evidence favorable to
14  an accused whether such evidence relates directly to guilt, to
15  matters relevant to punishment, or to credibility of a material
16  witness.
17      The Merrill Court cited People vs. Rutherford, 14
18  Cal.3d 399, and the Rutherford case was based upon the Brady
19  decision; therefore, it seems clear that a Brady violation may
20  occur if favorable material evidence is not disclosed prior to
21  the preliminary hearing.
22      This Court also cites Stanton vs. Superior Court, 193
23  Cal.App.3d 265 where the Court held that:
24          "The prosecution's failure to disclose
25      evidence material to defense cross-examination of
26      eyewitnesses at the preliminary hearing violates the
27      Rutherford rule and, therefore, the defendant was
28      entitled to have an element of the charged offense,

20

1     gross negligence, stricken from the record."

2          This Court now cites Currie, C-U-R-R-I-E, vs. Superior

3     Court at 230 Cal.App.3d 83.  The defendant there filed a

4     nonstatutory motion to dismiss based upon the prosecution's

5     failure to disclose until long after the preliminary hearing that

6     he had charged the victim with a misdemeanor filing of a false

7     report and that the charge was pending at the time of the

8     preliminary hearing.

9          The Court found that the district attorney failed to

10    abide by its duty to provide evidence to defendant prior to the

11    preliminary hearing.

12          With respect to Brady violations prior to the

13    preliminary hearings, I'm going to go back to the Merrill Court,

14    Merrill vs. Superior Court, 27 Cal.App.4th at 1586.  There the:

15              "Defendant was convicted of two murders

16          arising from an armed robbery.  Prior to trial, a

17          codefendant admitted committing the crimes.  A witness

18          positively identified the codefendant and another

19          witness saw two men near the crime scene but

20          emphatically denied the defendant was one of them.

21              The prosecution did not disclose to the

22          defense the second witness' statement.  The second

23          witness did not testify at the preliminary hearing and,

24          interestingly, at least to this Court, at trial the

25          prosecution did not ask the second witness if defendant

26          was in fact one of the two men he'd seen on the day of

27          the crimes.

28              The defendant learned of the witness' refusal

                                                              21

1    to identify him not until after his conviction."

2         The Merrill Court found that the failure to disclose

3    violated Rutherford, violated Brady as the witness' refusal to

4    identify defendant as the perpetrator of this material evidence

5    beneficial to the defense.

6         As for the remedy, the Court held that:

7              "The Court should look to the materiality of

8         the nondisclosed information and what effect it should

9         have on the determination of probable cause.

10             If the Court finds that after weighing all

11        the evidence, which means that you weigh the evidence

12        presented at the prelim as well as the suppressed

13        evidence, there is a reasonable possibility that the

14        magistrate would not have found probable cause, the

15        remedy is dismissal."

16        The Merrill Court ruled that:

17             "The trial court properly performed this

18        weighing process and did not abuse its discretion when

19        it ruled that the exculpatory value of the evidence in

20        that case was outweighed by any incriminating evidence

21        against the defendant."

22        In Stanton at 193 Cal.App.3d 265:

23             "The defendant was prosecuted for a vehicular

24        manslaughter with gross negligence.  The prosecution

25        failed to disclose an investigative report from a civil

26        attorney hired by decedent's family, and the civil

27        attorney had summaries of interviews with three

28        eyewitnesses.  Those were available prior to the

22

1    preliminary hearing.

2        The investigative reports contained

3    statements by eyewitnesses that were inconsistent with

4    statements provided to the district attorney's office

5    and which were testified to at the preliminary

6    hearing."

7        The Stanton Court found that:

8        "This suppressed evidence cast doubt on the

9    credibility of the witnesses' testimony at the

10   preliminary hearing, and the defendant was denied a

11   substantial right by the prosecution's failure to

12   disclose the report."

13       This Court is also mindful of Kyles vs. Whitley at page

14   49 where that Court states, quote:

15       "The cumulative effect of all withheld

16   evidence that is favorable to the defendant is

17   considered rather than individually considering each

18   item of evidence."

19       I want to direct myself now to the issue of

20   cross-examination and substantial right.  There is a CEB book

21   that I think everyone in this area of the law uses in criminal

22   law to prepare procedure and practice, and I'm talking now about

23   information provided on page 600.  They state in that treatise

24   that:

25       "Not every restriction of cross-examination

26   is considered a denial of a substantial right

27   sufficient to merit dismissal under a 995 motion."

28       They state that:

23

1          "The difference between a minor error and the

2     denial of a substantial right has generated

3     litigation," but their theory is that the general

4     guideline is that "when the subject of defendant's

5     counsel's cross-examination concerns the allegations in

6     the complaint and is aimed at establishing an

7     affirmative defense or defeating the prosecution's

8     case, a substantial right is violated."

9          With respect to cross-examination, Alford, A-L-F-O-R-D,

10    vs. US at 282 US 687 states at page 727:

11         "Cross-examination of a witness is a matter

12    of right."

13         Stated at 728:

14         "Denial of a substantial right --"

15    Well, it's stating that:

16         "Effective cross-examination is a safeguard

17    essential to a fair trial."

18         They go on to state in that case at page 728:

19         "Some principles should apply to preliminary

20    hearings.  Defendant is entitled to present evidence at

21    such hearings to establish that there is no probable

22    cause to hold him for trial and probable cause may be

23    dismissed by testimony elicited under cross-examination

24    as well as by direct testimony."

25         "Denial of a substantial right."  What does that mean?

26         In People vs. Mackey at 176 Cal.App.3d 177:

27         "The DA failed to disclose a statement from

28    key witnesses in spite of a discovery order compelling

24

1    disclosure of all witness' statements.  Failure to

2    disclose was a denial of a substantial right."

3        They went on to state at page 270:

4            "It is well settled that a denial of a

5    substantial right at the preliminary hearing renders

6    the ensuing commitment illegal and entitled the

7    defendant to dismissal of the information on timely

8    motion."

9        And at page 271, also citing Mackey, at page 185:

10           "Denial of cross-examination is a deprivation

11   of a substantial right rendering the holding order

12   unlawful."

13       They continue on on page 271 with some interesting

14   language that states:

15           "-- undisclosed report containing exculpatory

16   evidence on the focal issue before the magistrate and

17   would have served the dual purpose in impeaching the

18   district attorney's case and establishing an

19   affirmative defense on gross negligence and that the

20   defense unquestionably was handicapped by the

21   prosecutorial error of not providing the information."

22       Onto credibility of witnesses.

23       People vs. Phillips, 41 Cal.3d 29 at page 46 states:

24           "The duty to disclose all substantial

25   material evidence favorable to an accused includes

26   evidence relating to the credibility of a witness."

27           And at page 47:

28           "Again, despite his knowledge of the witness'

25

1    misleading answer, the DA remained silent and failed to

2    correct the testimony."

3         That's citing Moreland, People vs. West Moreland, 1538

4    Cal.App.2d 1532, which I'm concerned here.

5         People vs. Morris says at 46 Cal.3d 1 at page 30:

6              "The duty to disclose evidence favorable to

7         the accused extends to evidence which may reflect on

8         the credibility of a material witness."

9         And that also cites People vs. Rutherford, which I

10   talked about before, at page 406.

11        People vs. Phillips at 41 Cal.3d page 46, states:

12             "Nondisclosure was compounded by the district

13        attorney's affirmative misrepresentation."

14        I'm not sure that we go that far here.

15        Now I'm going to speak a little bit about what I

16   categorize as "false evidence."  In other words, that's the way

17   that it's spoken of in cases.  And the specific case I'm quoting

18   now is In Re Roberts.  It's a 2003 case at 29 Cal.4th 726 at page

19   742.  It states that:

20             "False evidence is substantial, material, or

21        probative if there is a reasonable probability that had

22        it not been introduced, the result would have been

23        different."

24        And the Roberts Court is citing In Re Sassounian,

25   S-A-S-S-O-U-N-I-A-N, 9 Cal.4th 535 at page 436 which is a case

26   that if you read in this area at all, everybody cites that case.

27        The Roberts case at page 742 also says:

28             "The requisite reasonable probability is a

26

1          chance great enough under the totality of the

2          circumstances to underline our confidence in the

3          outcome.  And the petitioner, the defendant, is not

4          required to show that the prosecution knew or should

5          have known that the testimony was false in order for it

6          to be considered false evidence."

7              That is Roberts citing People vs. Marshall, a 1996 case

8      at 13 Cal.4th 799 at page 830.

9              So what's the process?  I'm going to quote Brown now,

10     17 Cal.4th 873:

11                 "While tendency and force of undisclosed

12         evidence is evaluated item by item, its cumulative

13         effect for purposes of materiality must be considered

14         collectively.  And the reviewing Court may consider

15         directly any adverse effect that the prosecution's

16         failure might have had on the preparation or

17         presentation of defendant's case."

18             Stanton at page 1594 requires the reviewing Court to

19     add the nondisclosed information to the evidence which the

20     magistrate heard and then retest the sum for probable cause.

21             Merrill at page 1596, you have to include then reweigh,

22     not exclude and reweigh.

23             Merrill at 1597 noted that the trial court's

24     responsibility was extremely difficult having to reweigh the

25     evidence at the preliminary hearing after having heard the full

26     trial yet was barred from considering any of the trial evidence.

27     Quote:

28                 "It is the trial court's responsibility to

                                                                  27

1    accord weight and then to balance the relative

2    importance of the testimony.

3           When weighing, the Court may not overlook

4    exculpatory evidence nor consider incriminating

5    evidence from any source or the preliminary hearing,"

6    which is also required by the Stanton Court.

7           This Court again last night went back and reread the

8    preliminary hearing transcript.  So this is a two-day preliminary

9    hearing which took place on Thursday, November 4th, 2002, and it

10   also took place on November 15th, 2002.  A lot of people

11   testified.

12          Detective Davidson testified quite extensively.  In

13   fact, his testimony takes up the first volume.

14          The Court again read the testimony of Charles Markum,

15   Debra Becker, Otto Meyer, William McMahon, Greg Adair, Spencer

16   Tomasvary.

17          The Court reread the testimony of Steven Brown, who is

18   an employee of the sheriff's department, James Larry Lewis, Jr.,

19   Michael Potts, Bradford Burke, John Yount, Dre Allen Buetow, and

20   Russell Davidson.

21          With respect to Debra Becker, the Court was struck with

22   how unsure she was about when exactly she sold ammunition to

23   Mr. Rutledge.  In fact, she times her memory around certain

24   events in her life that were never nailed down by testimony which

25   had to do with the lights going off in Guerneville.  That

26   probably could have been found out, but it wasn't; timing to do

27   with some family member came to visit; and she also made some

28   statements that I thought were interesting, though.  When shown

                                                                28

1  the sheath to the knife, she didn't recognize the sheath.  In

2  fact she said, "No, it's a brown sheath.  Wrong color."

3          When she was questioned at one point, I guess the

4  defendant came in without his sheath and knife on:

5              "Did you ever ask him if he lost his knife?"

6      She says:

7              "Well, I think I did."

8          But later on, I think in probably cross, she said:

9              "I don't remember what he said."

10         Then there's a real problem nailing down her testimony

11  with respect to when she actually met Mr. Rutledge, and I'm

12  unclear as to that after reading the totality of her testimony.

13         She does say that she began working at Kings in either

14  April or May of '98 and that she might have met the defendant

15  after that, but I'm -- I'm not sure that that's really the year

16  that she began employment there.

17         When you look at just the testimony that's presented,

18  it says that Mr. Rutledge continued to come into the store.  In

19  fact, he was there a lot.  When he came into the store, he went

20  and looked at knives.  He also went and looked at knives even if

21  he was interested in something else.

22         All right.  He looked at knives, and he kept coming in

23  even after Detective Davidson talked to her.

24         With respect to Greg Adair, he says:

25              "Well, he's a friend of mine since junior

26          high, but we've grown apart.  Haven't seen him in the

27          last couple of years.  Certainly didn't target shoot

28          with Zach."

29

```
 1              Then he starts talking about this SKS rifle that he had
 2    had in his closet.  He says:
 3                       "Well, I know before the murders that the
 4              rifle was stolen, and I thought I know who did it, and
 5              so I --"
 6              At first he testifies that he went and got it.
 7                       "I went and got it and I confronted Zach."
 8              Well, if he went and got it, why did he testify later
 9    that it just suddenly reappeared in his closet?  And then he
10    testified to that:
11                       "No, I didn't see anyone actually take it,
12              and, no, I didn't see anyone actually return it."
13              So my question as I'm reading this is when he went to
14    confront the defendant, why didn't he just take back the rifle?
15              The testimony is not very compelling when I'm doing my
16    weighing process compounded with the fact that he had felony
17    charges dismissed about all of this time -- during this time in
18    response to his turning over that SKS rifle and perhaps
19    testifying.  That also was unclear with respect to the
20    transcript.
21              With respect to Spencer Tomasvary, he says:
22                       "Well, I've known Zach for most of my life."
23              When he's asked:
24                       "Did you and Zach and Dre Buetow go out
25              together?"
26                       "I don't really remember."
27              Looks like he wasn't interviewed for two years after
28    the murders.
```

30

1    He says:

2        "Yeah, we all went out.  I went out with the

3    defendant, but I don't think very often."

4        He confirms that what he told Detective Davidson was as

5    he remembered it at the time that he told him, but at the time of

6    this hearing he didn't remember much of anything as to what

7    happened although he did state he didn't know Dre Buetow very

8    well, but he did know him and evidently partied with him.

9        With respect to James Larry Davis, Jr., he says:

10        "Yeah, I've known the defendant for eight to

11    ten years.  In fact, I lived around the corner."

12        And he says:

13        "He called me up one time and he says, well,

14    Jason punched him in a bar and he wanted to come over."

15        But on cross-examination when -- well, on direct he

16    implies that it was pretty close to when the murders took place,

17    but then on cross he says:

18        "Well, it could have been two years before

19    that."

20        He says, well, at one point the defendant let him

21    borrow a knife, but he says later:

22        "A lot of people in Guerneville sell those

23    knives just like that."

24        The defendant may have asked him if he wanted to go

25    hunting one time.

26        But a conversation that I found the most interesting

27    which is when asked to identify the knife he at first says that

28    he could identify it but later on during cross-examination he

31

1    starts talking about a bone-handled knife.  So when questioned

2    further, and this is pretty confusing but I'm looking at the

3    record the way it is, he confirms the defendant only had one

4    knife and that at the conclusion of the testimony, I'm not sure

5    whether it was a bone-handled knife that he said that he only

6    wore one or whether or not it was a wood-handled knife that he

7    looked at in court, and it looks like he didn't know either.  But

8    he only carried one knife.

9           Then we have a paper that he signed at the coffee

10   bazaar with Mr. Thomas where he signed a piece of paper that said

11   that Zach never told him that a Jason beat him up.  And it was

12   confirmed on cross that, yes, he did read the paper that was

13   written out by Mr. Thomas before he signed it and was probably

14   right at the time that he signed it.

15          Then we have Mr. Dre Buetow who confirmed that he could

16   have been at some party sometime with all -- with Zach and with

17   Mr. Tomasvary.  He doesn't remember all three of them going out,

18   but he did lead an active social life.  He was in Guerneville

19   every weekend, and both of them were in the same circle of

20   friends that he hung out with.

21          So I've reread all of that.  And upon weighing all the

22   evidence, the evidence produced at the preliminary hearing and

23   considering the undisclosed evidence and the effect of the

24   undisclosed evidence and the effect of the testimony of

25   Mr. Potts, this Court finds that there is a reasonable

26   probability that the magistrate would not have found probable

27   cause.

28          The Court finds that the exculpatory value of the

                                                              32

1  suppressed evidence outweighs the possible incriminating evidence

2  presented against the defendant at the preliminary hearing.

3          But during one of the arguments that Mr. Nick made that

4  this Court finds compelling, it's not only what wasn't produced,

5  it's what was produced.

6          I think there's sufficient reason for this Court to

7  turn over the preliminary hearing based upon what was not

8  produced, but I'm more concerned about what was produced, and the

9  effect of having this marginal testimony remaining and the effect

10 of Mr. Potts's statement that based upon all of his analysis it

11 was a million to 1 that all of these layers matched.  It had to

12 have had an unbelievable -- well, completely believable effect

13 upon the magistrate, and it completely outweighs the rest of this

14 evidence so the Court is granting the motion.

15         **MR. JACOBS:**  Thank you, Your Honor.  We have nothing

16 further.

17         **MR. NICK:**  Your Honor, I ask that the Court order the

18 defendant released forthwith.

19         **THE COURT:**  He's released.

20         **MR. JACOBS:**  What -- do you want to know for the record

21 we will be refiling.  I mean, it's -- it doesn't matter, I'm

22 just -- he knows.

23         **THE COURT:**  Well, if you were to tell me you're going

24 to refile tomorrow, I can listen to that, but I haven't heard

25 that.

26         **MR. JACOBS:**  Well, we do intend to refile.

27         **THE COURT:**  Okay.

28         **MR. NICK:**  Well, Your Honor --

                                                                33

1          THE COURT:  I don't have any authority to hold him in

2     custody.

3          MR. JACOBS:  I understand.

4          THE COURT:  So he is released, and I'm hopeful that

5     you'll be in conversation with Mr. Nick so there can be some

6     arrangement for him to turn himself in at the appropriate time.

7          MR. JACOBS:  We --

8          MS. COOK:  We don't believe that he'll be released.  We

9     think that the procedures will take place this afternoon.

10          THE COURT:  Okay.  I didn't know that.  All right.

11          MS. COOK:  Thank you.

12          MR. NICK:  Well, Your Honor, wait a second.

13          MS. COOK:  When a case is dismissed on one day and

14     refiled the next --

15          MR. NICK:  Your Honor, there's an order from the Court

16     that defendant be released forthwith.

17          MS. COOK:  On this case, correct.

18          MR. NICK:  The sheriff's department doesn't have

19     authority to ignore that order.  So if they're going to go

20     through the process of refiling a complaint, they need to do it

21     here and now, otherwise, they can rearrest the defendant at a

22     time when their office makes a decision that that has occurred.

23     The defendant just can't sit there in jail while they determine

24     what to do.

25          MS. COOK:  This happens in a daily basis, and I'm sure

26     that Your Honor is aware of that.  What will happen is the

27     sheriff will begin processing the defendant on the current

28     dismissal.  In the meantime, our office will generate the

34

1    appropriate paperwork unrelated to this case.

2            **THE COURT:** I think it's a timing case, Mr. Nick. If

3    the paperwork gets there before the defendant is released, he

4    will be held on the new paper. The procedure that happens in the

5    jail will be up to the agencies.

6            **MS. COOK:** We state it for the Court and counsel's

7    benefit.

8            **THE COURT:** And if that's going to be the case, I'd

9    like to talk to counsel about the next step. Perhaps we can go

10   into chambers for a few minutes.

11           **MR. NICK:** Yes, Your Honor, I would like to.

12                      (OFF THE RECORD BENCH CONFERENCE)

13                              (OFF THE RECORD)

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                                    35

STATE OF CALIFORNIA )
                     ) ss.
COUNTY OF SONOMA     )


                    CERTIFICATE OF REPORTER


        I, CARLOS A. MARTINEZ, a Certified Shorthand Reporter

of the State of California, do hereby certify that the foregoing

pages, numbered 1 to 36, inclusive, are a true and correct

transcription of my shorthand notes taken on June 14, 2004, in

the matter entitled THE PEOPLE OF THE STATE OF CALIFORNIA,

Plaintiff, versus ZACHARIAH RUTLEDGE, Defendant, No. SCR-32528,

in the criminal files of the Superior Court of California, County

of Sonoma.




        Dated this 28th day of _____, 2004.




                              _____
                              CARLOS A. MARTINEZ
                              Certified Shorthand Reporter #10620




                                                              36

Exhibit 11

SPEC:  CRIMINALIST
CALIFORNIA STATE PERSONNEL BOARD

SPECIFICATION

CRIMINALIST
Series Specification
(Established May 28, 1972)

SCOPE

This series specification describes four Criminalist classes used by
the Department of Justice.  These classes are used for positions that
conduct, supervise and provide training in connection with complex
technical laboratory analyses with respect to the identification of
criminals and investigation of crimes.

| Schem Code | Class Code | Class |
|------|------|-------|
| VF30 | 8466 | Criminalist |
| VF20 | 8478 | Senior Criminalist |
| VF10 | 8477 | Criminalist Supervisor |
| VF08 | 8467 | Criminalist Manager |

DEFINITION OF SERIES

Criminalists conduct examinations of crime scenes for physical
evidence, and in complex cases make all types of chemical analyses
such as alcohol determinations, toxicological analyses of foods and
body viscera and fluids; test for drugs and explosives, and various
types of microchemical tests; make the difficult microscopic,
chemical, and serological tests on blood and other physiological
fluid stains; identify and compare hair, fibers, soil, paint, glass,
building materials and other substances in forensic cases; make
visual, microscopic and other technical examinations and comparisons
of tool marks, firearms and other weapons, bullets, cartridge cases
and ammunition; make casts; make and develop photographs and
photomicrographs using black and white and color films; use complex
measuring, recording and testing instruments and devices; prepare
evidence and exhibits and testify in court as expert witnesses;
assist local law enforcement officers and prosecutors in analyzing
and interpreting evidence; write reports and correspondence; give
instruction in this field at peace officer training schools; and
provide forensic research, application, advanced casework,

methodology development, and training to State and/or local forensic
scientists and law enforcement agencies.


DEFINITION OF LEVELS


CRIMINALIST

This is the entry, training and subjourney level for the series.
Under general direction, Criminalists will perform routine and less
complex technical laboratory analyses and assist higher level
Criminalists in the examination of crime scenes and in the scientific
investigation of crimes.


SENIOR CRIMINALIST

This is the full journey level of the series.  Incumbents are
assigned to the more complex Criminalist analyses.  They may act as
leadpersons to coordinate the work of lower level Criminalists.
Incumbents may also be assigned to provide training, application,
methodology development, and research related to the field of
criminalistics.


CRIMINALIST SUPERVISOR

This is the working supervisor level where incumbents are responsible
for directing the work of a minimum of four Criminalists and/or
laboratory technicians/assistants within:  (1) a field office engaged
in various criminalistic disciplines, (2) the California
Criminalistic Institute engaged in organizing and providing forensic
research, application, advanced casework, training and methodology
development in one specialized criminalistic discipline, or (3) a
forensic laboratory engaged in independent research as well as the
design and direction of complex research projects and training
programs.  Staff at this level may also be assigned the most
difficult advanced forensic casework and courtroom testimony with
wide discretion and independence of action.


CRIMINALIST MANAGER

Plans, organizes and directs the criminalistic program in an assigned
area of the State.  Incumbents at this level must supervise two or
more Criminalist Supervisors.  May also direct complex and sensitive
forensic science projects which have a significant impact on the
Bureau or the field of criminalistics.

MINIMUM QUALIFICATIONS

CRIMINALIST

Education:  Equivalent to graduation from college with a major in o
of the physical or biological sciences, including the equivalent of
eight semester hours of general chemistry and three semester hours
quantitative analysis.  Registration as a senior in a recognized
institution will admit applicants to the examination but they must
produce proof of graduation or its equivalent before they are
eligible for appointment.  Candidates who have graduated from colle
with a major in one of the physical or biological sciences, includi
the eight semester hours of general chemistry, but do not possess t
three semester hours of quantitative analysis will be admitted to t
examination, but they must produce proof of completion of the three
semester hours of quantitative analysis before they are eligible fo
appointment.


SENIOR CRIMINALIST

Either I

Two years of experience in the California state service performing
the duties of a Criminalist, Range C.

Or II

Experience:  Four years of professional experience beyond the train
level in a physical or biological science laboratory setting
performing the duties of a chemist, biochemist or a related positio
This experience must have included at least two years as a
Criminalist having independent responsibility for making quantitati
and qualitative analyses.  (One year of postgraduate education in o
of the physical or biological sciences may be substituted for one
year of the required general experience.)  Experience in California
state service applied toward this requirement must include at least
two years performing the duties of a Criminalist, Range C.  and


Education:  Equivalent to graduation from college with a major in o
of the physical or biological sciences, including the equivalent of
eight semester hours of general chemistry and three semester hours
quantitative analysis.

Or III

Experience:  Four years of professional experience in a physical or
biological science laboratory setting performing independent resear
related to Forensic Science.  (Possession of a master's degree in a
physical or biological science may be substituted for one year of
experience and possession of a Ph.D. in a physical or biological

science for two years of the required experience.)  Experience in
California state service applied toward this requirement must inclu
at least two years performing the duties of a Criminalist, Range C.
and

Education:  Equivalent to graduation from college with a major in o
of the physical or biological sciences, including the equivalent of
eight semester hours of general chemistry and three semester hours
quantitative analysis.


CRIMINALIST SUPERVISOR

                        Either I
One year of experience in the California state service performing t
duties of a Senior Criminalist.
                        Or II
Experience:  Broad and extensive (more than five years) of
professional experience in a physical or biological science
laboratory setting performing the duties of a chemist, biochemist o
a related position.  (One year of postgraduate education in one of
the physical or biological sciences may be substituted for one year
of the required general experience.)  Experience in California stat
service applied toward this requirement must include at least one
year performing the duties of a Senior Criminalist.  and

Education:  Equivalent to graduation from college with a major in o
of the physical or biological sciences, including the equivalent of
eight semester hours of general chemistry and three semester hours
quantitative analysis.
                        Or III
Experience:  Broad and extensive (more than five years) of
professional experience in a physical or biological science
laboratory setting performing independent research related to
Forensic Science.  (Possession of a master's degree in a physical o
biological science may be substituted for one year of experience an
possession of a Ph.D. in a physical or biological science may be
substituted for two years of the required experience.)  Experience
California state service applied toward this requirement must inclu
at least one year performing the duties of a Senior Criminalist.  a

Education:  Equivalent to graduation from college with a major in o
of the physical or biological sciences, including the equivalent of
eight semester hours of general chemistry.


CRIMINALIST MANAGER

                              Either I
One year of experience in the California state service performing the
duties of a Criminalist Supervisor.
                              Or II
Experience:  Broad and extensive (more than five years) of
professional experience in a physical or biological science
laboratory setting performing the duties of a chemist, biochemist or
a related position.  This experience must have included at least two
years as a supervising criminalist.  (One year of postgraduate
education in one of the physical or biological sciences may be
substituted for one year of the required general experience.)
Experience in California state service applied toward this
requirement must include at least one year performing the duties of
Criminalist Supervisor.  and

Education:  Equivalent to graduation from college with a major in one
of the physical or biological sciences, including the equivalent of
eight semester hours of general chemistry and three semester hours of
quantitative analysis.
                              Or III
Experience:  Broad and extensive (more than five years) of
professional experience in a physical or biological science
laboratory setting performing independent research related to
Forensic Science.  This experience must have included at least two
years in the design and direction of scientific research.  This
experience must also have included at least two years of supervision.
(Possession of a master's degree in a physical or biological science
may be substituted for one year of general experience and possession
of a Ph.D. in a physical or biological science may be substituted for
two years of the required general experience.)  Experience in
California state service applied to this requirement must include at
least one year performing the duties of a Criminalist Supervisor.
and

Education:  Equivalent to graduation from college with a major in one
of the physical or biological sciences, including the equivalent of
eight semester hours of general chemistry.


                        KNOWLEDGE AND ABILITIES


ALL LEVELS:

Knowledge of:  Scientific methods and techniques used in examining
crime scenes; tests for the identity and comparison of blood and
physiological fluids; tests for explosives and flammable materials;
toxicological analyses; tests of hair and fibers, glass, soil, paint
and similar materials, and equipment necessary to conduct these

tests; modern methods and techniques in investigations of major
crimes; current trends in toxicology, general chemistry and
microchemistry; modern types of small arms and the techniques
of conducting all types of firearms, bullet, and tool mark
comparisons; methods used in the examination of documents in criminal
cases; photographic and photomicrographic principles and practices as
applied to Criminalists; chromatographic techniques.

Ability to:  Make extensive use of scientific methods and techniques
at the scene of a crime; make effective use of microscopes,
spectrograph, infrared and ultra-violet spectrophotometer, and gas
chromatograph; use micro methods for determining physical constants
such as refractive index and density; recognize the need for and
develop and evaluate new test methods and procedures; analyze
situations accurately and take effective action; conduct applied
research to develop and validate state-of-the-art evidence
examination techniques; testify effectively in court; instruct law
enforcement and forensic personnel in criminalistics; prepare course
outlines and lesson plans which will satisfy the requirements set
forth by the Commission on Peace Officers' Standards and Training
(POST).


CRIMINALIST SUPERVISOR
CRIMINALIST MANAGER

Knowledge of:  Department's Affirmative Action Program objectives; a
manager's role in the Affirmative Action Program and the processes
available to meet affirmative action objectives.

Ability to:  Effectively contribute to the Department's affirmative
action objectives.


DRUG TESTING REQUIREMENT

Applicants for positions in this class series are required to pass a
drug screening test.


SPECIAL PERSONAL CHARACTERISTICS

ALL LEVELS:

Tact, patience, and keenness of observation.


CLASS HISTORY

| Class | Date Established | Date Revised | Title Changed |
|-------|------------------|--------------|---------------|
| Criminalist | 2/28/89 | 1/12/93 | -- |
| Senior Criminalist | 4/19/72 | 1/12/93 | 2/28/89 |
| Criminalist Supervisor | 2/6/64 | 1/12/93 | 2/28/89 |
| Criminalist Manager | 6/28/72 | 1/12/93 | 2/28/89 |